## Commonwealth v. Roberts

*Herbert S. Levin,* for plaintiff.

*Alvin E. Echols, Jr.,* for defendant.

GOLD, P. J., June 29, 1962.—. . . Defendant, Bishop William M. Roberts, holds himself out as practicing faith healing. His congregation is The Royal Priesthood Holy Church in Philadelphia. On or about March 6, 1961, Mrs. Susie Murphy, having heard about the bishop, took her five year old daughter to him for care. The child was suffering from a congenital heart condition.

Upon entering defendant's church, a receptionist took down the child's history and told Mrs. Murphy that the cost would be from $10 to $20.

After a considerable wait, Mrs. Murphy and her daughter were admitted to defendant's office. Upon the command of defendant, the child was stripped to the waist, and defendant placed his ear against the child's chest, listened, and applied an oil to her chest by rubbing it. Defendant uttered some prayers, stamped his feet, and then, suddenly, without warning, tilted the child's head back and poured some of the preparation into her mouth.

Defendant gave Mrs. Murphy a bottle of the preparation for which she paid $20. She was told to return with the child three more times for the same treatment for which a charge of $20 for each visit would be made.

The child was ill after leaving defendant's office. Mrs. Murphy did not administer any more of the preparation but, subsequently, complained to the Pennsylvania Department of Justice. An agent of the Pennsylvania Department of Justice had the preparation analyzed and it was found to be a mixture of olive oil and isopropyl alcohol in the proportion of 90 per cent to 10 per cent, respectively. Thereafter, the present actions

in equity were commenced on behalf of the Commonwealth.

We feel defendant's conduct went beyond healing by spiritual means and amounted to practicing medicine without a license, in violation of the Medical Practice Act of June 3, 1911, P. L. 639. The distinction between the practice of medicine and faith healing is to be found in First Church of Christ, Scientist, 205 Pa. 543 (1903). In that case, healing was by inaudible prayer only, but the charge was concerned with the cure of disease by its faith and prayers. Its precepts included the cure of organic, functional, and contagious diseases for which compensation was received. The master, to whom the application for charter was referred, recommended it be refused on the ground "it would be injurious to the community . . ." The lower court adopted the master's recommendations. On appeal, our Supreme Court unanimously affirmed. The court stated, at page 560:

"Our laws recognize disease as a grim reality to be met and grappled with as such. To secure the safety and protect the health of the public from the acts of incompetent persons, the law prescribes the qualifications of those who shall be allowed to attempt the cure or healing of disease. It is not for the purpose of compelling the use of any particular remedies, or of any remedies at all. It is only designed to secure competent service for those who desire to obtain medical attendance . . . Neither the law, nor reason, has any objection to the offering of prayer for the recovery of the sick. But in many cases both law and common sense require the use of other means which have been given to us for the healing of sickness and the cure of disease. There is ample room for the office of prayer, in seeking for the blessing of restored health, even when we have faithfully and conscientiously used all the means known to the science and art of medicine."

We strongly feel that the reasoning of First Church of Christ, Scientist, supra, should be applied to the instant case. To permit defendant to attempt to heal by administration of a drug, or combination of drugs, especially in the instant case where his "patient" was suffering from a congenital heart condition, is extremely dangerous to the public. Continued treatment of people afflicted with diseases by prayers and administering a drug, even if it merely be olive oil, may cause the death of one of our citizens who might otherwise have been saved by a competent physician. We will not sit idly by and await the possible serious result. We, therefore, hold that defendant is violating the Medical Practice Act.

As for the Commonwealth's remaining contentions, to wit, that defendant violated the Drugs and Medical Supplies Manufacturers' Act and the Pharmacy Practice Act, we think what we have said concerning defendant's illegal practice of medicine is also determinative of these questions.

Because we already found that defendant violated the Medical Practice Act, we think it necessarily follows that defendant also "manufactured and dispensed drugs", as well as prepared, dispensed or sold drugs for the cure of physical ailments, by utilizing the substance of olive oil and isopropyl alcohol. "Drug" is defined in the Pharmacy Practice Act of May 17, 1917, P. L. 208, sec. 1, as amended, as follows:

". . . all medicine and preparations recognized in the United States Pharmacopoeia, the National Formulary . . . for internal or external use, and any other substance, or mixture of substances, intended to be used for the cure, mitigation, or prevention of disease of either man or other animals."

"Pharmacy" includes "any place where drugs, medicines or poisons are compounded, dispensed, prepared, or sold at retail."

Under section 2 of the Drugs and Medical Supplies Manufacturers' Act of May 16, 1945, P. L. 615, it is required that no place of manufacture shall be conducted or kept open for the transaction of business until it has been registered with, and a certificate of registration has been issued by the State Board of Pharmacy.

Both olive oil and isopropyl alcohol, of which defendant's preparation consists, are listed as drugs in the United States Pharmacopoeia and National Formulary, respectively. Because defendant prepared, administered and charged a fee for use of this mixture, we are convinced that he has violated the two statutes in question.

In view of our findings, we believe defendant's practices menace the health, safety and welfare of the citizens of our community and he should be prohibited from further conduct of this nature.

The evidence in this case convinces us that plaintiffs are entitled to equitable relief. . . .

*Decree Nisi*

And now, to wit, June 2, 1962, upon consideration of the foregoing case, it is ordered, adjudged and decreed, as follows:

1. Defendant is perpetually enjoined from in any way:

a. Engaging in the practice of medicine.

b. Pretending to a knowledge of the practice of medicine.

c. Administering, prescribing or recommending any preparation recognized in the United States Pharmacopoeia and/or the National Formulary for internal or external use, or any other substance or mixture of substances, for or toward the cure, mitigation or prevention of disease or illness.

d. Simulating the conduct and behavior of physi-

cians in the examination, diagnosis and treatment of ill, afflicted or diseased persons.

e. Manufacturing drugs or medical supplies.

f. Dispensing or selling drugs and medicines, or otherwise engaging in the practice of pharmacy.

2. Defendant is ordered to pay the costs of these proceedings.